UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, | |
| v. | Case No. 23 CR 183 |
| Denquan Williams | Judge Jorge L. Alonso |

## Memorandum Opinion and Order

Defendant Denquan Williams moves to suppress evidence stemming from police officers' search and seizure of him and his bag, arguing the officers lacked reasonable suspicion for a *Terry* stop and frisk. As explained below, the Court denies Williams' motion to suppress (ECF No. 27).

## Background

At approximately 8:16 p.m. on August 14, 2022, an anonymous 911 caller told a dispatcher that a Black male wearing black clothes and sandals who was "across the street from KFC on Madison and Laramie" had a "a little black bag, got a gun in it" and that the caller had "seen the gun in the bag" when the man had asked KFC employees for food which they refused. (Gov't Ex. 1, ECF No. 39.) A police dispatcher relayed this information to Chicago Police Officers Matthew Segovia, Mauricio Rodriguez, and Emile Domer, who were patrolling Chicago's 15th police district in an unmarked car as members of a tactical team. (Ev. Hr'g Tr. at 10:8–11:5, ECF No. 41.) Specifically, the police dispatcher reported: "A person with a gun, Madison and Laramie . . . across from the KFC. Caller states a male black wearing all black has a gun in a black bag." (*Id.* at 13:9–14, 31:10–12, 32:11–14; Gov't Ex. 2, ECF No. 39.) Based on this, Officers Segovia and Rodriguez believed that the male identified by the 911 caller may have been engaging in criminal activity—specifically, carrying a firearm beyond what is allowed by

the Illinois Firearm Concealed Carry Act (FCCA) or otherwise unlawfully. (Ev. Hr'g Tr. at 13:16–14:12, 32:17–33:1). The Illinois FCCA permits a person, in certain circumstances, to obtain a license to carry a handgun but only if the handgun is carried "completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5. Officers Segovia and Rodriguez had previously responded to hundreds of 911 calls in the two-block radius around Madison and Laramie resulting in hundreds of arrests, mostly related to unlawful firearm possession or the illegal possession or sale of narcotics. (Ev. Hr'g Tr. at 22:25–23:21, 40:13–41:18.)

A few minutes after being dispatched, the officers arrived at the scene and parked in the KFC parking lot near Madison and Laramie. (*Id.* at 14:22–25, 17:15–16, 33:2–7.) Officers Segovia and Rodriguez saw Williams, who was wearing all black and had a small black bag slung across his stomach, standing next to the door to the KFC and identified him as the person referred to in the 911 call but noticed that he had apparently moved from across the street to stand next to the KFC itself. (*Id.* at 16:14–17:16, 34:14–35:14; Gov't Ex. 3 at 20:22:15, ECF No. 39.[1]) The officers approached Williams and said, "Just so you know, they're calling." (Gov't Ex. 3 at 20:22:15.) Williams responded, "Nah, we just came here trying to get some food, boss, that's all." (*Id.*) Officer Rodriguez testified that he saw what looked like the butt end of a firearm protruding from a small black bag as he approached Williams. (Ev. Hr'g Tr. at 42:7–43:22, 45:21–23.) Williams' right hand was resting on the top of the bag, which was slung across his stomach. (*Id.* at 18:18–24; Gov't Ex. 3 at 20:22:15.) A woman who was standing next to Williams raised her right hand between the approaching officers and Williams and his bag, but

---

[1] In this opinion, citations to Officer Segovia's body-worn-camera footage refer to the timestamps in the upper-right corner of the footage.

2

soon after pulled her hand back when Officer Rodriguez reached for Williams' hand. (Ev. Hr'g Tr. at 20:17–19; Gov't Ex. 3 at 20:22:20.) The officers considered Williams' hand position unnatural and believed Williams' and the woman's behavior suggested Williams may have been trying to conceal an illegally possessed firearm, including because Williams had not informed them that he was carrying a firearm or that he had a concealed-carry permit. (Ev. Hr'g Tr. at 18:21–19:9, 19:18–20:11, 20:17–25, 22:3–24, 36:20–37:13, 38:14–40:12.)

At this point, Officer Rodriguez grabbed Williams' hand and removed it from the bag, revealing the butt of a handgun protruding from the bag. (Ev. Hr'g Tr. at 21:1–4, 21:13–18, 39:3–7; Gov't Ex. 3 at 20:22:22.) The officers removed the gun from his bag, determined that Williams did not possess a Firearm Owners Identification or Concealed Carry License, and arrested Williams for being a felon in possession of a firearm. (Ev. Hr'g Tr. at 12:2–5, 21:7–10, 31:13–16, 39:3–7; Gov't Ex. 3 at 20:22:26.)

Williams was eventually indicted in this District for being a felon in possession of a firearm under 18 U.S.C. 922(g)(1) for the August 14, 2022, incident. (*See* Indictment, ECF No. 1.) He has moved to suppress evidence including the seized gun and other fruits of his encounter with police that evening, which the Court now considers. (*See* ECF No. 27.)

## Legal Standard

The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. Though seizures generally are reasonable only when based on probable cause, police officers may conduct a so-called "*Terry* stop" and "briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot." *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion to justify a *Terry* stop "exists only when an

officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry*, 392 U.S. at 21). It "requires more than an 'inchoate and unparticularized suspicion or "hunch"' but 'considerably less than preponderance of the evidence.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000)). A court evaluates reasonable suspicion based on the "totality of the circumstances" of each case. *Id.*

For an officer to conduct a frisk, the officer must have reasonable suspicion not only that criminal activity is afoot but also "that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30. The officer thus must "point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013).

## Discussion

As explained below, the Court concludes that police officers had reasonable suspicion to conduct a *Terry* stop when they removed Williams' hand from his bag and frisked him.

### I. Time of the stop

First, the parties dispute when the officers seized Williams and thus when they needed to have reasonable suspicion that Williams was involved in criminal activity. The government contends the seizure occurred when the officers touched Williams' hand; Williams claims the stop occurred slightly earlier, when the officers approached Williams with their weapons visible. The Court agrees with the government—as explained in the cases it cites, for which Williams offers no counter, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also United States v. Douglass*, 467 F.3d 621,

4

624 (7th Cir. 2006) (affirming denial of suppression where "officers had not drawn their weapons"). The officers thus did not seize Williams until a few moments later when they moved Williams' hand. Accordingly, the Court will assess the constitutionality of the officers' *Terry* stop as of that that moment.

## II. The officers had reasonable suspicion of firearm-related criminal activity

Considering the totality of the circumstances, the Court concludes that officers had reasonable suspicion to conduct a *Terry* stop of Williams at the time they moved his hand from his bag.

Much of the officers' suspicion relies on information provided by the anonymous 911 caller and then relayed to them by the police dispatcher. Information from an anonymous caller can support reasonable suspicion if it is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Here, the caller recounted that he had seen a Black male dressed in black clothing with a firearm in a black bag across from the KFC restaurant. The officers saw that Williams reliably met that description when they arrived at the scene a few minutes later—he, a Black male, was dressed in black clothing, carried a black bag, and was standing next to the KFC, a short distance from where the 911 caller had reported him.

However, the information obtained from the 911 call likely would not be enough on its own to justify stopping and frisking Williams. Though it was reasonable for officers to conclude that Williams was the person identified in the 911 call and was carrying a gun in his bag, the 911 caller had reported only that he had seen a gun in the black bag—and thus, arguably, the gun was "mostly concealed," which would be legal if Williams was a concealed-carry license holder. *See J.L.*, 529 U.S. at 272 (rejecting a "firearm exception" to the *Terry* analysis). This distinguishes

5

the case from one in which a suspect had reportedly been seen carrying a firearm openly or in a place where firearm possession, even if concealed, was illegal. *See, e.g.*, *United States v. Swinney*, 28 F.4th 864 (7th Cir. 2022) (affirming reasonable-suspicion finding where an anonymous tip "reliably reported a man carrying a gun in a liquor store, which is a crime in Illinois"). Instead, the 911 call merely indicated that Williams had a concealed firearm, which, if Williams had a concealed-carry permit, would be legal in Illinois. *See United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018) ("[A] mere possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion." (internal quotation marks and citation omitted)).

But importantly, Officer Rodriguez testified that he saw the butt end of a firearm when he approached Williams—before he moved Williams' hand. (Ev. Hr'g Tr. at 42:7–43:21, 45:21–23.) Though this was omitted from a report Officer Rodriguez signed on December 5, 2022, an August 14, 2022, report had stated that officers "conducted a street stop . . . and immediately observed the butt end of a firearm protruding from the cross body bag." (Def. Ex. C at 5, ECF No. 27-1.) Though the August 2022 report arguably suggested that officers observed the butt end of the firearm only after they conducted the *Terry* stop, Officer Rodriguez clarified that he saw it before the stop and then again after the stop. (Ev. Hr'g Tr. at 50:4–14.) Having seen the firearm protruding from Williams' bag before seizing him, officers had a reasonable suspicion of criminal activity—that Williams had a firearm and was not keeping it adequately concealed even if he had a concealed-carry license, and thus was both involved in criminal activity and was armed and dangerous. *See United States v. Triplett*, No. 20 CR 00665, 2020 WL 7319573, at *2 (N.D. Ill. Dec. 11, 2020) (finding reasonable suspicion where an officer had seen the defendant "exposing part of a handgun while standing on a public sidewalk" because "[l]icensed handgun owners cannot carry their weapons openly"); *see also United States v. Barnett*, 505 F.3d 637, 640

(7th Cir. 2007) ("[S]ome crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime."). The officers' stop and frisk of Williams at that point thus was constitutional.

The government points to other factors it claims establish reasonable suspicion—that Williams was in a high-crime area particularly known for illegal firearm possession, he unnaturally placed his hand on his bag and did not announce that he was armed or a concealed-carry holder, and the woman next to Williams placed her hand between the officers and Williams' bag. The Court gives some weight to those factors, but not much. Williams' and the woman's behaviors as described in the record, while not mitigating, were only marginally suspicious. Contrary to the officers' and the government's implication, neither Williams nor his companion was required to stand at attention with their arms at their sides when encountered by police, and their behavior was not especially evasive. *See Williams*, 731 F.3d at 687 ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination.") (*See* Ev. Hr'g Tr. at 28:5–7 (Officer Segovia agreeing that Williams' posture "could be a natural way to carry a bag").) The Court also is mindful that though the area in which the officers encountered Williams was a frequent site of firearm-related offenses, "[p]eople who live in rough neighborhoods . . . should not be subject to more intrusive police practices than are those from wealthy neighborhoods." *Watson*, 900 F.3d at 897. Nevertheless, when coupled with the information provided by the 911 caller and the officers' own observations upon encountering Williams at the KFC, especially Rodriguez seeing a firearm protruding from Williams' bag (without which this case would be

7

much closer), the Court concludes that the officers had reasonable suspicion to undertake a *Terry* stop.

### III. The officers did not need additional suspicion that Williams was "presently dangerous"

Williams argues that even if the officers had reasonable suspicion that he was armed, they needed an additional reasonable suspicion that he was not only armed but also "presently dangerous" before frisking him. This overreads *Terry*'s holding that a frisk is justified only when an officer has reasonable suspicion "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30. As the government identifies, a person's present danger naturally follows from that person being armed; so long as there is reasonable suspicion that a person is armed, no additional suspicion of present danger is necessary to justify a frisk. *See United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013) ("*Terry* permits the officer . . . to conduct a limited search of the suspect to determine whether he is armed, when the circumstances give rise to a reasonable belief that the individuals may have a weapon *and thus* pose a danger to the officer or others in the immediate vicinity." (emphasis added)). The officers' reasonable suspicion that Williams was unlawfully carrying a firearm thus justified their *Terry* stop and frisk.

### Conclusion

The Court denies Williams' motion to suppress (ECF No. 27).

**SO ORDERED.**  **ENTERED: August 29, 2024**

_____
**HON. JORGE ALONSO**
**United States District Judge**